**In re Gregory RUTHERFORD dba Rolling Pin Bakery and Catering, Debtor.**

**Bankruptcy No. 93–30873.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Feb. 21, 1995.

Katherine E. McGuire and Dean Edward Hines, McGuire & Hines, Dayton, OH, for debtor.

Stephen Sherman, Civil Trial Section, Tax Div., U.S. Dept. of Justice, Washington, DC, for I.R.S.

Pamela Stanek, Asst. U.S. Atty., Dayton, OH, for U.S.

## DECISION AND ORDER ALLOWING. CLAIM OF INTERNAL REVENUE SERVICE

WILLIAM A. CLARK, Chief Judge.

This matter is before the court upon the Debtor's objection to a proof of claim filed by the Internal Revenue Service. The court has jurisdiction pursuant to 28 U.S.C. § 1334 and the standing order of reference entered in this district. This matter is a core proceeding under § 157(b)(2)(B)—allowance or disallowance of claims against the estate.

## FACTS

1) On March 10, 1993, Gregory Rutherford ("Debtor"), doing-business-as Rolling Pin Bakery and Catering ("Rolling Pin") filed a petition in bankruptcy under chapter 11 of the Bankruptcy Code;

2) The Debtor operated Rolling Pin as a sole proprietorship in Englewood, Ohio, from 1984 until early 1992;

3) During the 1990's, Rolling Pin experienced delinquencies in its payment of federal payroll taxes. In 1991, the Internal Revenue Service (IRS) assessed the Debtor for payroll tax deficiencies for 1990. In 1992, the IRS assessed the Debtor for a failure to pay payroll taxes for the last two quarters of 1991 and the first quarter of 1992. Thereafter, the Debtor negotiated an agreement with the IRS to pay $1,500 per month on the assessments. The Debtor does not contest that he is liable for these amounts;

4) At the beginning of 1992, the Debtor and Timothy Brown formed R.P. Bakery, Inc. ("The Corporation") and filed articles of incorporation in February 1992. The corporation consisted of two operating divisions: Rolling Pin Bakery and Catering and Eagle One (an interstate trucking company). Prior to the formation of the Corporation, Timothy Brown had operated Eagle One as a sole proprietorship. The Debtor and Mr. Brown had been friends for nearly thirty years and hoped that the merger of their two businesses would enable them to invest in a fishing lake. The Debtor testified that he had hoped that Mr. Brown's computer expertise would make the bakery's operation more efficient;

5) The Corporation issued 200 shares of common stock. The Debtor owned 101 shares of the stock, and Mr. Brown owned 99 shares;

6) The Debtor was the president of the Corporation, and Mr. Brown was the vice-president. Mr. Brown testified that he was the treasurer of the Corporation, although the Debtor also stated that he was the treasurer;

7) The Corporation established a corporate bank account with Central Trust Bank (Account No. 427136531). Both the Debtor

and Mr. Brown had authority to sign checks on the account, and both wrote checks on the account;

8) The corporate office was in Cincinnati, Ohio, until late in 1992 when it was moved to Englewood, Ohio, where the bakery operations were located. The move was made to save expenses;

9) During 1992, the Debtor was responsible for the daily operations at the bakery, and Mr. Brown was responsible for the trucking operations. Although the Debtor and Mr. Brown talked almost daily, the Debtor never had any involvement with the trucking division and never talked to any creditors of the trucking operation;

10) "Administration" of both divisions of the Corporation was viewed as the responsibility of Mr. Brown. He performed the record keeping, paid the bills, kept track of accounts receivable and accounts payable, and monitored bank deposits. Mr. Brown was responsible for the payment of the operating expenses of both divisions, and he decided which creditors would be paid. He was also responsible for the payroll of both divisions. In addition, Mr. Brown testified that it was solely his decision to decide whether to write a check to the IRS, and he decided to pay trade creditors rather than the IRS. The financial operations of the corporation were managed through a computer system. Mr. Brown knew how to operate the computer, but the Debtor did not;

11) Bank account statements and cancelled checks were sent to the corporate office;

12) During 1992, Mr. Brown continued to maintain a separate bank account at Bank One for "Eagle One Express." Mr. Brown and his wife were the only authorized signers on this account. Frequently funds were transferred by Mr. Brown from the corporate account to the "Eagle One Express" account, and vice versa;

13) During the last six months of 1992, 1365 checks were written on corporate account number 427136531. Mr. Brown signed 1212 (89%) of them, and the Debtor signed 153 (11%). Of the 153 checks signed by the Debtor, 151 were for payroll. Only two of the checks were for non-payroll purposes;

14) During the first three months of 1993, 87 checks were written on corporate account number 427161129. Mr. Brown signed 59 (68%) of them, and the debtor signed 28 (32%). Of the 28 checks signed by the Debtor, 26 were for payroll;

15) Although the Corporation had been making some of the $1,500 monthly payments owed by the Debtor for his previous operation of Rolling Pin, on or about November 12, 1992, the Debtor received a Notice of Intent to Levy for unpaid payroll taxes due for the sole proprietorship;

16) The Debtor discussed the Notice of Intent to Levy with Mr. Brown. According to the Debtor, Mr. Brown told him that he had fallen behind on the previous payroll taxes of Rolling Pin and the Debtor should offer to pay the IRS $3,000 a month. The Debtor also testified that Mr. Brown told him that the Corporation's current payroll taxes were being paid;

Mr. Brown testified that he did not remember what he told the Debtor when the Notice of Intent to Levy was received. He further testified that he did not know at what point he told the Debtor that he had stopped paying the Corporation's payroll taxes; it may have been in 1992, but Mr. Brown was not certain;

17) During the fall of 1992, the Debtor received telephone calls from a few suppliers and Dayton Power & Light concerning unpaid bills. The Debtor referred these calls to Mr. Brown. In addition, in order to retain L. Karp and Sons as a supplier, the Corporation made weekly payments to L. Karp and Sons instead of normal monthly payments;

18) On December 24, 1992, the Debtor discharged two employees from the bakery division of the corporation in order to cut labor costs;

19) In December of 1992, the Debtor and Mr. Brown opened a second Corporate bank account with Central Trust (Account No. 427161129). Both the Debtor and Mr. Brown had signatory authority on the account, and both wrote checks on this account;

20) On several occasions the Debtor asked Mr. Brown about the Corporation's financial

condition and the status of the Corporation's payroll taxes. According to the Debtor, Mr. Brown assured him that the taxes were being taken care of and the Corporation was not in financial trouble. The Debtor relied on Mr. Brown's statements and did nothing else to investigate whether the Corporation's payroll taxes were being made. The Debtor testified that he relied on Mr. Brown's statements because that was Mr. Brown's part of the business—his specialty—and the Debtor had no reason to doubt Mr. Brown;

21) On January 7, 1993, the Debtor met with Kathy Stose, a revenue officer with the IRS. The purpose of the meeting was to discuss the nonpayment of payroll taxes by Rolling Pin. During the meeting, Ms. Stose became aware that a corporation was also involved, but she did not know on that date the status of the Corporation's payment of payroll taxes.

Although there is a discrepancy with an earlier deposition, the Debtor testified that he did not know that the Corporation was delinquent in its payroll taxes for the third and fourth quarters of 1992, until late February of 1993;

22) On March 6, 1993, the Debtor filed 941 tax returns on behalf of the Corporation for the third and fourth quarters of 1992;

23) The last tax deposit made by the Corporation was August 26, 1992. The Corporation made no tax deposits for the fourth quarter of 1992;

24) During the month of January, 1993, $31,562 was deposited in a Corporate bank account (No. 427136531) with Central Trust. Deposits were also made into Account No. 427161129 with Central Trust: $56,766 for the month of January, 1993, $42,590 during February, and $8,585 during March;

25) During the third quarter of 1992, the Corporation paid $26,624.12 to the IRS. The IRS first applied this amount to the employer portion of FICA taxes, which is not subject to 26 U.S.C. § 6672. The Corporation had not instructed the IRS where to apply the payment;

26) The IRS asserts in its proof of claim that it is owed $126,699.59 by the Debtor. The Debtor only contests the payroll taxes due by the Corporation during the third and fourth quarters of 1992, which total $52,-820.63.

The IRS maintains that the Debtor is also liable for the third and fourth quarter payments of $52,820.63 as a "responsible person" under 26 U.S.C. § 6672.

## CONCLUSIONS OF LAW

Sections 3102 and 3402 of the Internal Revenue Code require employers to withhold social security taxes and income taxes imposed on employees from the employees' wages. The sums withheld are commonly referred to as "trust fund taxes," reflecting the Internal Revenue Code's provision that such withholdings are deemed to be a "special fund in trust for the United States." 26 U.S.C. § 7501(a). *Slodov v. United States,* 436 U.S. 238, 242–43, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978).

> Because the Code requires the employer to collect taxes as wages are paid, § 3102(a), while requiring payment of such taxes only quarterly, the funds accumulated during the quarter can be a tempting source of ready cash to a failing corporation beleaguered by creditors. Once net wages are paid to the employee, the taxes withheld are credited to the employee regardless of whether they are paid by the employer, so that the IRS has recourse only against the employer for their payment.
>
> An employer who fails to pay taxes withheld from its employees' wages is, of course, liable for the taxes which should have been paid, §§ 3102(b) and 3403. *Id.,* 436 U.S. at 243, 98 S.Ct. at 1783.

"These 'trust fund taxes' are for the exclusive use of the Government and are not to be used to pay the employer's business expenses, including salaries, or for any other purpose." *McGlothin v. United States,* 720 F.2d 6, 8 (6th Cir.1983). In order to protect the government from losses of these funds, Congress enacted § 6672 of the Internal Revenue Code, which provides the government with another source from which to collect the withheld taxes. *Id.*

Section 6672 of the Internal Revenue Code provides that:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.... 26 U.S.C. § 6672(a).

"Liability attaches if an individual meets two requirements. He must be a 'responsible person' under the statute, and he must 'willfully' fail to pay over to the Government the amount due." *McGlothin v. United States, supra,* 720 F.2d at 8.

### Responsible Person

For purposes of § 6672, "person" is defined by § 6671(b) of the Internal Revenue Code as *including* "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." Such a person is generally designated a "responsible person" in the decisional law. The language of §§ 6672 and 6671(b) "does not require that [the responsible persons] be officers or employees of the corporation at all, so long as they are in fact responsible for controlling corporate disbursements." *Pacific National Insurance Co. v. United States,* 422 F.2d 26, 30–31 (9th Cir.1970).

In this court's circuit, "the test for determining the responsibility of a person under § 6672 is essentially a functional one, focusing upon the degree of influence and control which the person exercised over the financial affairs of the corporation and, specifically, disbursements of funds and the priority of payments to creditors." *Gephart v. United States,* 818 F.2d 469, 473 (6th Cir.1987). Among the specific facts upon which courts have relied in determining whether individuals were persons responsible for the payment of taxes withheld from the wages of employees are:

(1) the duties of the officer as outlined by the corporate by-laws;

(2) the ability of the individual to sign checks of the corporation;

(3) the identity of the officers, directors, and shareholders of the corporation; ·

(4) the identity of the individuals who hired and fired employees;

(5) the identity of the individuals who were in control of the financial affairs of the corporation. *Id.*

"Essentially, liability is predicated upon the existence of *significant, as opposed to absolute, control* of the corporation's finances." *Id.* (emphasis supplied)

It is basically a factual inquiry. Generally, such a person is one 'with *ultimate authority* over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes,' or more explicitly, one who has 'authority to direct payment of creditors.' *Id.* (emphasis supplied; citations omitted)

In the instant matter, the Debtor had the ability to sign checks with respect to both Corporate bank accounts and did so. The fact that he wrote fewer checks than Mr. Brown is not controlling. What is important is that the Debtor could have written the checks to pay the government its trust funds. In addition, the Debtor was the majority shareholder of the Corporation as well as the president of the Corporation. He also hired and fired employees.

All of these factors persuade the court that the Debtor was in a position to exercise ultimate authority over the expenditure of the Corporation's funds. Even if corporate structure is ignored, it is evident that the Debtor possessed at least significant control of the Corporation's finances.

It can not be denied that the Debtor relied upon Mr. Brown's computer expertise to manage the Corporation's finances. However, "[m]ore than one person can be a responsible officer of a corporation." *Id.* In other words, the statute applies to all responsible persons, not just to the most responsible person. *Gustin v. United States,* 876 F.2d 485, 491 (5th Cir.1989). Nor does § 6672 confine liability for the unpaid taxes

only to the single officer with the greatest or the closest control or authority over corporate affairs. *Gephart, supra,* 818 F.2d at 476. While it may be that Mr. Brown was *more* responsible than the Debtor, and exercised *greater* authority, this does not affect a finding of liability against the Debtor. *Id.* The Debtor may have regarded Mr. Brown as solely responsible for paying the taxes to the government, but "[o]ne does not cease to be a responsible person merely by delegating that responsibility to others...." *Gustin, supra,* 876 F.2d at 491.

The court therefore finds that the Debtor was a "responsible person" under 16 U.S.C. § 6672.

### Willfulness

■ "A responsible person is liable under section 6672 only if he or she 'willfully' fails to ensure that withholding taxes are paid." *Wood v. United States,* 808 F.2d 411, 415 (5th Cir.1987). The term "willfully" generally means a voluntary, conscious, and intentional act; it is not necessary, however, to show a bad motive or evil intent. *Mazo v. United States,* 591 F.2d 1151, 1154 (5th Cir. 1979).

■ "Willfulness is present if the responsible person had knowledge of the tax delinquency and knowingly failed to rectify it when there were available funds to pay the government." *Gephart, supra,* 818 F.2d at 475. Here, however, the Debtor testified at trial that he had no actual knowledge of the tax delinquencies until February 1993. Even if the Debtor's assertions are correct, he is not relieved from liability in the present case. While it is true that conduct amounting to no more than negligence is not willful for purposes of § 6672, willfulness will exist where a responsible person has "deliberately or recklessly disregarded facts and known risks that the taxes were not being paid." *Calderone v. United States,* 799 F.2d 254, 260 (6th Cir. 1986).

In the instant case, by the end of 1992 enough facts were known to the Debtor to alert him to the strong possibility that the Corporation's withholding taxes were not being paid. Because of an IRS "Notice of Intent to Levy," the Debtor knew that the Corporation was in default of paying the payroll taxes for the previous sole proprietorship. The Debtor was receiving telephone calls from creditors with respect to past due bills. The Debtor was involved in shutting down the Corporation's Cincinnati office and releasing two bakery employees in order to cut costs. All of these facts indicated the strong likelihood that the Corporation was in financial difficulty. Evidence of the Debtor's awareness of the risk that the Corporation was financially troubled and that the Corporation's payroll taxes were not being paid is found in the fact that the Debtor specifically questioned Mr. Brown several times in late 1992 regarding the Corporation's financial condition and the status of the Corporation's taxes.

Unfortunately, the Debtor's efforts stopped at this point. Although the court recognizes that the Debtor did not possess great financial expertise, he did not perform the simple tasks of requesting a cancelled check for the tax payments or contacting the IRS with regard to such payments. Only slight inquiry would have been required by the Debtor to inform him that the Corporation's payroll taxes were not being paid. The court finds that the Debtor at least knew that he did not know whether the taxes had been paid, and that he failed to take reasonable steps to resolve the uncertainty. To excuse the Debtor from liability because he did not further investigate the status of the Corporation's tax payments is untenable:

> [T]his argument amounts to the position that even with knowledge of a corporation's financial straits a responsible officer may immunize himself from the consequences of his actions by wearing blinders which will shut out all knowledge of the liability for and the nonpayment of its withholding taxes. But such a deliberate or reckless disregard of the facts and known risks cannot blunt the impact of the penalty statute on those responsible for such nonpayment.... *Calderone, supra,* 799 F.2d at 260 (citation omitted).

The Debtor recklessly disregarded facts and known risks that the taxes were not being paid, and therefore he acted "willfully"

for purposes of 26 U.S.C. § 6672. *See Internal Revenue Service v. Blais,* 612 F.Supp. 700, 711 (D.Mass.1985).

Because the Debtor is charged with knowledge of the Corporation's tax delinquencies no later than the end of 1992, he is liable under § 6672 to the extent that the Corporation used unencumbered funds after that date to pay creditors in preference of the IRS. *Honey v. United States,* 963 F.2d 1083, 1089 (8th Cir.1992). "[F]unds are encumbered only where the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability and if that legal obligation is superior to the interest of the IRS in the funds." *Id.,* at 1090.

> [T]rust fund taxes are for the exclusive use of the government and cannot be used to pay business expenses of the employer, including salaries. (citation omitted) It is no excuse that, as a matter of sound business judgment, the money was paid to suppliers and for wages in order to keep the corporation operating as a going concern—the government cannot be made an unwilling partner in a floundering business. (citation omitted) *Collins v. United States,* 848 F.2d 740, 741–42 (6th Cir.1988).

■ The record demonstrates that approximately $139,000 passed through two of the Corporation's bank accounts after the Debtor is charged with knowledge of the Corporation's tax delinquency, and there is no evidence in the record that those funds were encumbered. Therefore, the Debtor is liable for the Corporation's 1992 third and fourth quarter trust funds in the amount of $52,820.63.

■ Finally, the Debtor asserts that $26,-624 paid by the Corporation to the IRS should be allocated to any trust fund obligation of the Debtor. The Supreme Court has held that a bankruptcy court "may order the IRS to apply tax payments to offset trust fund obligations where it concludes that this action is necessary for a reorganization's success." *United States v. Energy Resources Co., Inc.,* 495 U.S. 545, 551, 110 S.Ct. 2139, 2143, 109 L.Ed.2d 580 (1990). The court finds, however, that this issue is not ripe for decision. No plan of reorganization is currently before the court nor any other evidence to demonstrate whether tax allocation is necessary for a successful reorganization of the Debtor. The Debtor may raise this issue in connection with confirmation of his plan. It must be pointed out, however, that the Corporation which made the tax payment is not the debtor in this case. Therefore, at any hearing on the issue of allocation, Debtor's counsel must convince the court that it has jurisdiction to reallocate a tax payment previously made by the Corporation.

For the foregoing reasons, it is hereby ORDERED that the claim of the Internal Revenue Service is ALLOWED in the amount of $126,699.59.